UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

        Plaintiff,

    vs.                        REPORT AND RECOMMENDATION

Randall Gene Whitefeather,

        Defendant.           Crim. No. 05-388 (DWF/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendant Randall Gene Whitefeather:

> 1.     The Defendant's Motion for the Suppression of Confessions or Statements.
>
> 2.     The Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure.

A Hearing on the Motions was conducted on December 6, 2005, at which time, the Defendant appeared personally, and by James E. Ostgard, Esq., and the Government

appeared by Tracy T. Braun, Assistant United States Attorney. For reasons which follow, we recommend that the Defendant's Motion to Exclude Confessions and Statements be denied, and that his Motion to Suppress Evidence Obtained as a Result of Search and Seizure also be denied.[1]

## II. Factual Background

The Defendant is charged with one Count of Aggravated Sexual Abuse, in violation of Title 18 U.S.C. §§1151, 1152, 2241(c) and 2246(2), and one Count of Sexual Abuse of a Minor, in violation of Title 18 U.S.C. §§1151, 1153, 2243(a)(1), and 2246(2). The alleged Aggravated Sexual Abuse is said to have occurred from April 23, 2002, through June 23, 2004, while the alleged Sexual Abuse of a Minor is alleged to have occurred from May 24, 2005, through July 28, 2005. The alleged violations

---

[1]At the close of the Hearing, the Government requested leave to submit additional documentation concerning some of the issues, which had been raised during the Hearing on the Motions. Leave was granted, and the last submission on the issues was received on December 20, 2005, at which time, the Motions were taken under advisement. See, Title 18 U.S.C. §3161(h) (1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 767-77 (8th Cir. 1995). Subsequently, we directed counsel to respond to an inquiry concerning the legal status of the person -- Denfield "Sonny" Johnson -- who represented the Defendant in Tribal Court and, as we further detail in this Report, on January 13, 2006, counsel for the Defendant confirmed that the person was not a lawyer, but was a lay advocate. Accordingly, the "under advisement" date commenced on January 13.

are also alleged to have occurred within the exterior boundaries of the Red Lake Indian Reservation, in this State and District.   As pertinent to those charges, and to the Motions pending before us, the operative facts may be briefly summarized.[2]

Gerald Johnson ("Johnson"), who is a Sergeant with the Bemidji Police Department, testified at the Hearing on the Motions.   On September 7, 2005, Johnson received a telephone call from John Egelhof ("Egelhof"), who is a Special Agent for the Federal Bureau of Investigation.   According to Johnson, Egelhof advised him of a reported sexual assault that had occurred within the City of Bemidji.   On the same day, Johnson was contacted by Leonard Red Cloud ("Red Cloud"), who is a Sergeant with the Red Lake Tribal Police Department, and who provided Johnson with the same information that had been obtained from Egelhof, along with tribal police reports concerning the Defendant's arrest on September 4, 2005, for the Tribal charges of

---

[2]Rule 12(e), Federal Rules of Criminal Procedure, provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record."   As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.   Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent devel-opment of the facts and law may require.   See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

Carnal Knowledge of Children, Indecent Liberties, Child Endangerment, and Child Neglect.  Defendant's Exhibit 1.  According to the reports, the tribal investigation of those charges disclosed that at least one sexual assault was reported to have occurred within the City of Bemidji.  Id.

After reviewing the police report, Johnson, and Mark Nelson ("Nelson"), who is also an officer with the Bemidji Police Department, drove to the Red Lake Indian Reservation, in order to interview the Defendant concerning the reported sexual assaults that had occurred in Bemidji.[3]  At the time of the interview, the Defendant had been arraigned in Tribal Court on two Counts of Indecent Liberties, and two Counts of Child Endangerment, and he was in the custody of the Tribal police department.  Government's Exhibit 5.  The Tribal Court also appointed "S. Johnson" to represent the Defendant on the Tribal charges.[4]  Id.  The interview was conducted in  a small

---

[3]Johnson testified that his sole purpose in interviewing the Defendant was to investigate the alleged assaults that had occurred in Bemidji, and not to assist the tribal authorities in their investigation of the tribal charges.

[4]Neither party has presented evidence concerning the status of "S. Johnson"in the Red Lake Tribal Court but, from our consideration of prior cases involving the Red Lake Indian Reservation, we are aware that the the Red Lake Tribe has licensed a number of "lay advocates" to practice before the Tribal Court, in addition to a number of licensed attorneys.  In two (2) such prior cases, we have been presented with Exhibits which list "Denfield 'Sonny' Johnson" as a lay advocate.  See, United
(continued...)

classroom, at the Red Lake Criminal Justice Center.   The classroom contained approximately fifteen (15) to twenty (20) chairs, a whiteboard, and windows facing into a hallway.

The officers began their interview by asking the Defendant some preliminary questions, such as his name, residence, date of birth, and his relationship to the alleged victim.  Government's Exhibits 1 and 2.  The officers then advised the Defendant that there had been some allegations of sexual abuse that had occurred within the City of Bemidji, at the residence of the Defendant's aunt -- Ruby Whitefeather -- and they expressed their interest in talking to the Defendant about his relationship with L.J., who is the alleged victim of the sexual abuse.   At this point, the officers advised the Defendant of his constitutional rights, pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), using a standard issue card, and asked the Defendant whether he understood his rights.   The Defendant stated that he understood his rights, at which time, the following exchange took place:

_____

[4](...continued)
States v. Lawrence, Crim. No. 05-333 (MJD/RLE), Government Exhibit 9; and United States v. Roy, Crim. No. 04-477 (MJD/RLE), Government Exhibit 2 to letter of Government's counsel dated May 9, 2005 (Docket No. 59).  As we have noted, after affording the parties an opportunity to inform the Court on "S. Johnson's" legal status, counsel for the Defendant has advised that "S. Johnson" is a lay advocate.

Johnson:      Do you want to talk to us about your relationship with [L.J.] and explain where these allegations are coming from, or * * *.

Defendant:   Um, do you mind if I have my lawyer with me? He's (inaudible).

Johnson:      Is he a court appointed lawyer or what's the deal?

Defendant:   Yeh, from the Red Lake Courts here.

Johnson:      If, ah, I suppose we can make arrangements. Is that what you would like to do?

Defendant:   Um, as far as, well as far as what you need to know I don't know what you want to know.

Johnson:      Well, there is [sic] some allegations that there is sexual contact and by that, we are talking about sexual intercourse.

Defendant:   Alright.

Government Exhibit 2, at pp. 21-22.

Johnson testified that he inquired as to whether the Defendant's attorney was appointed by the Tribal Court, because he was aware that the Tribal Court will sometimes appoint persons who are not attorneys to represent persons charged with tribal offenses.   Based on the Defendant's responses, following their offer to arrange for the presence of counsel, the officers assumed that the Defendant was willing to talk

to them, and they proceeded to question the Defendant concerning the alleged sexual assaults.

Throughout the remainder of the interview, the Defendant was responsive to the officers' questions, and did not express any desire to end the interview, nor did he make any further references to his tribally appointed advocate.  After the officers had finished their questioning, they turned off the tape recorder, and Johnson provided the Defendant with a business card.  The Defendant asked the officers what was going to happen to him, and Johnson advised the Defendant that he would provide the information, that had been disclosed, to the County Attorney, who would determine how to proceed.  At that point, the Defendant asked the officers to turn the tape recorder back on, because he had more information to provide them.  The officers turned the tape recorder back on, and recommenced the interview.  The tape recorder was turned off for approximately five minutes, during which time, the officers did not ask the Defendant any questions, and the entirety of the interview lasted approximately two (2) hours.

Later that afternoon, at approximately 1:00 o'clock p.m., the Defendant placed a telephone call to Johnson, in which he advised Johnson that he had more information that he wanted to share with the officers, and he asked them to return to Red Lake.

Johnson and Nelson drove back to Red Lake and interviewed the Defendant for a second time, at the Criminal Justice Center, and in the same room as that morning interview.  Nelson commenced the interview by advising the Defendant of his <u>Miranda</u> rights.  The Defendant stated that he understood his rights, and acknowledged that he had contacted Johnson, in order to provide the officers with additional information. Johnson then made the following inquiry:

> Can you tell us what it is you wanted to talk to us about? Something must have been (inaudible)[5] after we left and that's why you called me?

After some pause, the Defendant responded:

> Yeah kind of.  I guess since I told you what I told you then I figure I might as well tell you everything.
<u>Government's Exhibits 1 and 3</u>.

The second interview lasted approximately thirty-two (32) minutes, during which time, the Defendant answered all the officers' questions, and made numerous incriminating statements.  At no time during the second interview did the Defendant express a desire

---

[5]It appears from the audio recording of the interview that Johnson stated that "Something must have been eating at you after we left and that's why you called me?" <u>Government's Exhibit 1</u>.

to end the interview, or to have counsel present, and it does not appear that the officers made any threats or promises to induce the Defendant's statements.

Based on L.J.'s disclosures to Red Cloud, that she had been sexually assaulted by the Defendant at the home of Ruby Whitefeather, as well as the Defendant's admissions during the interview on September 8 concerning his relationship with L.J., Johnson applied for, and received a Search Warrant, for the residence of Ruby Whitefeather.

### III.  Discussion

The Defendant contends that the statements he provided to Johnson and Nelson were taken in violation of both Massiah v. United States, 377 U.S. 201 (1964), and Edwards v. Arizona, 451 U.S. 477 (1981), as well as the Fifth and Sixth Amendments, because formal charges had been brought against him, in Tribal Court, and because he had invoked his right to counsel, during the initial interview.  The Defendant also challenges the validity of the Search Warrant, which was executed at Ruby Whitefeather's residence, on its four corners, and as the fruit of the assertedly unlawful statements.

A.    <u>The Defendant's Motion to Suppress Confessions or Statements</u>.

1.    <u>Standard of Review</u>.   Government agents are not required to administer Miranda warnings to everyone whom they question.   See, <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977).   Rather, <u>Miranda</u> warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"   <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994), quoting <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966); <u>United States v. Helmel</u>, 769 F.2d 1306, 1320 (8th Cir. 1985); <u>Berkemer v. McCarty</u>, 468 U.S. 420, 428-29 (1984).

If a person is subjected to a custodial interrogation, he or she "has the right to consult with an attorney and to have counsel present during questioning."   <u>Davis v. United States</u>, 512 U.S. 452, 457 (1994).   To exercise that right, however, a suspect "must unambiguously request counsel," which "'requires at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'"   <u>Id.</u> at 459, quoting <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 178 (1991).   Furthermore, "if a suspect makes a reference to an attorney that is ambiguous or equivocal * * * [such] that the suspect **might** be invoking his right to counsel, our precedents do not require the cessation of questioning."   <u>Id.</u> [emphasis

in original]. In addition, "the Sixth Amendment right to counsel 'does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Von Kahl v. United States, 242 F.3d 783, 789 (8th Cir. 2001), quoting McNeil v. Wisconsin, supra at 175.

"The right to counsel recognized in Miranda is sufficiently important to suspects in criminal investigations, * * * that it 'requir[es] the special protection of the knowing and intelligent waiver standard.'" Davis v. United States, supra at 458, quoting Edwards v. Arizona, supra at 483. Nevertheless, "[i]f the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him." Id., citing North Carolina v. Butler, 441 U.S. 369, 372-376 (1979); see also, United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994). The burden rests with the Government to prove, by a preponderance of the evidence, that the Defendant knowingly and voluntarily waived his Miranda rights. See, Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Dougherty, 810 F.2d 763, 773 (8th Cir. 1987). However, "Miranda has no application to statements * * * that are voluntarily offered and are not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response." United States v.

- 11 -

<u>Griffin</u>, 922 F.2d 1343, 1357 (8th Cir. 1990), citing <u>United States v. McGauley</u>, 786

F.2d 888, 891 (8th Cir. 1986), and <u>United States v. Webster</u>, 769 F.2d 487, 492 (8th

Cir. 1985).

Further, the Supreme Court has recognized that, in order for a confession to be

admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's

right against self-incrimination.  See, <u>Dickerson v. United States</u>, 530 U.S. 428, 433-34

(2000).  For a confession to be considered voluntary, a Court must examine "'whether

a defendant's will was overborne' by the circumstances surrounding the giving of a

confession."  <u>Dickerson v. United States</u>, supra at 434, citing <u>Schneckloth v.</u>

<u>Bustamonte</u>, 412 U.S. 218, 226 (1973).

As the Supreme Court has recently explained:

> The due process test takes into consideration "the totality
> of all the surrounding circumstances -- both the
> characteristics of the accused and the details of the
> interrogation." [Schneckloth v. Bustamonte, 412 U.S. at
> 226.] See also Haynes [v. Washington, 373 U.S. 503, 513]
> (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962);
> Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the
> circumstances attendant upon the confession must be taken
> into account"); Malinski v. New York, [324 U.S. 401, 404]
> (1945)("If all the attendant circumstances indicate that the
> confession was coerced or compelled, it may not be used
> to convict a defendant").  The determination "depend[s]
> upon a weighing of the circumstances of pressure against

> the power of resistance of the person confessing."  Stein v.
> New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507 U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly, 479 U.S. 157, 167 (1986); the length of the interrogation, see, Ashcraft v. Tennessee, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v. Denno, 347 U.S. 556, 561 (1954).  See also, Withrow v. Williams, supra at 693 (listing the applicable considerations).

   2.   Legal Analysis.  The Defendant has independently challenged the admissibility of his statements under both the Fifth and Sixth Amendments.  We address each of these contentions, in turn.

      a.   The Sixth Amrndment.  As we have noted, "the Sixth Amendment right to counsel 'does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."  Von Kahl v. United States, supra at 789, quoting McNeil v. Wisconsin, supra at 175.  Thus,

the question becomes whether the charges against the Defendant, under the Red Lake Tribal Code, as well as his arraignment in Tribal Court on those charges, caused the Defendant's Sixth Amendment rights to attach.

There is a paucity of authority regarding the effect that the initiation of Tribal proceedings has on the attachment of Sixth Amendment rights in the Federal Courts of law. The primary cases have been issued from the Sixth Circuit, the Eighth Circuit, and the Ninth Circuit. At first blush, it would appear that the authority from our own Court of Appeals would control the outcome of this matter. However, the context in which our Court of Appeals considered the impact of tribal proceedings appears to be unique to one particular Tribe, and is distinguishable from the circumstances with which we are presented. We begin our analysis by reviewing the general principles of Sixth Amendment jurisprudence, in the context of Indian Tribes.

"Neither the Sixth Amendment nor any of the other guarantees of individual rights in the United States Constitution apply of their own force to Indian tribes." United States v. Doherty, 126 F.3d 769, 777 (6th Cir. 1997), partially abrogated on other grounds, Texas v. Cobb, 532 U.S. 162 (2001); see also, Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56 (1978), citing Talton v. Mayes, 163 U.S. 376 (1896). Instead, "[t]he right to an attorney in tribal court is guaranteed by the Indian Civil

Rights Act (ICRA), 25 U.S.C. §1302(6)(2001), but only at the expense of the defendant." United States v. Red Bird, 287 F.3d 709, 713 (8th Cir. 2002)("Red Bird II").  Thus, as a general rule, a defendant's right to counsel in tribal proceedings is statutory, and not constitutional.  See, United States v. Doherty, supra at 782.

Outside of our Court of Appeals, the Courts which have confronted the issue have held that, because the Sixth Amendment does not apply in Tribal Court proceedings, an arraignment in Tribal Court does not result in the attachment of the Sixth Amendment rights.  See, United States v. Charley, 396 F.3d 1074, 1082-83 (9th Cir. 2005)("That [the defendant] was arraigned in tribal court * * * is irrelevant to determining when her Sixth Amendment right to counsel attached because we have squarely held that 'the Sixth Amendment right to counsel does not apply in tribal court criminal proceedings.'"), quoting United States v. Percy, 250 F.3d 720, 725 (9th Cir. 2001); see also, United States v. Doherty, supra.  Thus, under those authorities, the Defendant's Sixth Amendment rights had not attached at the time that Johnson conducted his interview, irrespective of his arraignment in Tribal Court.

However, the Courts within our Circuit, which have confronted the issue presented, have reached a different conclusion, and have held that an arraignment in Tribal Court is sufficient to trigger the protections of the Sixth Amendment.  See,

- 15 -

United States v. Red Bird, 146 F. Supp.2d 993 (D.S.D. 2001), aff'd, Red Bird II, supra; United States v. Swift Hawk, 125 F. Supp.2d 384 (D.S.D. 2000).  In each of those cases, the Courts were confronted with crimes committed by members of the Rosebud Sioux Tribe, which is unique among Tribes, in that the Rosebud Sioux Tribal Constitution "guarantees the right to be represented by an attorney, and the tribe provides indigent defendants with a licensed attorney from the tribal public defender's office." Red Bird II, supra at 713.

Additionally, in Red Bird, the Courts took particular notice of the way in which the Tribal authorities, and the Federal Agents, worked "in tandem * * * to deliberately elicit information from [the defendant], knowing that [he] had been indicted in an adversarial proceeding for the same charge and that [the defendant] was represented by an attorney on that charge." Id. at 714; see also, United States v. Swift Hawk, supra at 386-89 (noting that "the federal government and the tribe, two sovereigns, were cooperating in the investigation and charging of the defendant," and that they were "working in tandem" on charges that were essentially identical).

We find that the decisions of Red Bird, and Swift Hawk, are distinguishable. Here, there is no evidence that the Red Lake Tribe has a constitution, which contains a provision for the appointment of counsel for indigent defendants, at the expense of

the Tribe, similar to that of the Rosebud Sioux Tribal Constitution.  Moreover, unlike Red Bird, where the defendant "had been appointed an attorney who was licensed to serve him in both tribal and federal court,"  Red Bird II, supra at 714, the Defendant here was appointed a "lay advocate," as opposed to a licensed attorney.[6]

In addition, we find that, here, the State, Federal, and Tribal authorities, were not working "in tandem."  Unlike in Red Bird, where the Federal and Tribal investigators interviewed the defendant together, concerning events which would comprise both the Federal and Tribal charges, no Tribal or Federal investigators were present during the interview of the Defendant, by Johnson and Nelson and, according to the testimony of Johnson, the sole purpose of the interview was to investigate the alleged sexual abuse that occurred within the City of Bemidji, and not events which had occurred on the Red Lake Reservation.  As such, we find that the decisions in Swift Hawk, and Red Bird, are confined to the unique characteristics of the Rosebud Sioux Tribe -- particularly insofar as that Tribe provides for a right to appointed, and licensed legal counsel, at the Tribe's expense -- and do not apply to the facts of this matter.  Instead, we rely on the holding in United States v. Charley, that an arraignment in Tribal Court,

---

[6]See, footnote 4, infra.

did not trigger the protections of the Defendant's Sixth Amendment rights, and therefore, the Defendant's interrogation was not in violation of any such rights.

Even if we were to conclude that the Defendant's Sixth Amendment rights had attached, we would still find that the Defendant's Sixth Amendment rights had not been violated by the officers' interrogation.  As our Court of Appeals has recently stated, Texas v. Cobb, 532 U.S. 162 (2001) "makes it uncompromisingly clear that the Sixth Amendment right * * * is 'offense specific.'"  United States v. Johnson, 352 F.3d 339, 343 (8th Cir. 2003); see also, United States v. Kraft, 2005 WL 578313 at *3 (D. Minn., March 11, 2005).  The Sixth Amendment "cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information or arraignment."  United States v. Kraft, supra at *3, quoting Texas v. Cobb, supra at 167-68.

"[W]hether an offense is the same for Sixth Amendment purposes depends, in the first instance, on the 'test' laid out for double-jeopardy purposes in Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)."  United States v. Johnson, supra at 343.  In Blockburger v. United States, supra at 304, the Supreme Court observed that, "where the same act or transaction constitutes a

violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."   Pursuant to <u>Texas v. Cobb</u>, "[e]ven if an uncharged crime is factually related to a charged crime, if the uncharged crime is distinct, meaning that it requires proof of some element that the other crime does not, the Sixth Amendment will not attach."   <u>United States v. Paz</u>, 124 Fed.Appx. 743, 2005 WL 548198 at *1 (3rd Cir., March 8, 2005), citing <u>Texas v. Cobb</u>, supra at 173.

Here, the Defendant was charged in Tribal Court with two Counts of Indecent Liberties, for his alleged inappropriate kissing of L.J., on September 3, and 4, 2005, and two Counts of Child Endangerment.   One of the Child Endangerment charges alleges that the Defendant hit L.J. in the face, while the other alleges that the Defendant raped L.J. on two different instances.   The Defendant is charged in Federal Court with one Count of Aggravated Sexual Abuse, and one Count of Sexual Abuse of a Minor. The time periods for the Federal charges are limited to the period from April 23, 2002, to June 23, 2004, for the Count of Aggravated Sexual Abuse, and the period from May 24, 2005, to July 28, 2005, for the Count of Sexual Abuse of a Minor.

As an initial matter, it is apparent from the charging documents that the bulk of the Tribal charges could not have caused the Defendant's Sixth Amendment rights to

- 19 -

attach, as they are not predicated upon the same acts or transactions as the Federal charges. Specifically, the events which gave rise to the two Counts of Indecent Liberties occurred in September of 2005, which is after the time period that is encompassed within the Federal charges. Similarly, the Tribal charge for Child Endangerment, that is predicated on the alleged physical abuse, appears to have occurred at a time that is not encompassed by the Federal charges -- March of 2005 -- see, Defendant's Exhibit 1,[7] and in any event, the Federal charges appear to be limited to sexual acts, rather than any sort of physical abuse.

The final Tribal charge of Child Endangerment is predicated on two alleged incidents of rape that were perpetrated against L.J. by the Defendant. According to Red Cloud's report, L.J. reported that one of the rapes had occurred approximately one and one-half weeks prior to the interview on September 4, 2005, in Bemidji, while the date, and location, of the other alleged incident of rape was not disclosed, and does not otherwise appear in this Record. Accordingly, while the one alleged incident

---

[7]Red Cloud's report suggests that, according to L.R., the Defendant hit her approximately six (6) months prior to her interview with Red Cloud. Defendant's Exhibit 1. That interview occurred on September 4, 2005. As such, it appears that the alleged physical assault, which comprises the Tribal charge, occurred in March of 2005.

of rape occurred sometime in late August of 2005 -- i.e., not within the pertinent time period for the Federal charges -- we cannot foreclose the possibility that the other incident of rape occurred during the time period encompassed within the Federal charges, and within the boundaries of the Red Lake Reservation.

However, even assuming that the one instance of rape serves as a predicate for both the Federal charges and Tribal charges, applying <u>Cobb</u>, we still find that the Sixth Amendment did not attach.  As here pertinent, Child Endangerment, under Section 503.07 of the Red Lake Tribal Code, occurs when "[a] parent, legal guardian, or caretaker * * * endangers a child by * * * intentionally or recklessly causing or permitting a child to be placed in a situation likely to substantially harm the child's physical, mental, or emotional health or cause the child's death."  While the terms of this provision are not specifically defined, it seems apparent that, in order to prosecute an individual under this Section, a showing must be made that the relationship between the person charged, and the alleged victim, was that of a "parent, legal guardian, or caretaker."  Moreover, it also appears that the provision encompasses conduct that would not be considered a sexual act.[8]  On the other hand, both Title 18 U.S.C.

---

[8]Such an interpretation is further supported by the fact that the alleged physical
(continued...)

§§2241(c) and 2243(a), which are the offenses charged in the Indictment, require proof that the person charged, while in the territorial jurisdiction of the United States, knowingly engaged in a "sexual act" with a minor, but they do not require a showing of any defined relationship between the person charged and the alleged victim.

Accordingly, since proof of the charge of Child Endangerment would require proof of a specific relationship between the Defendant and L.J., but would not require proof of a sexual act, while proof of the Federal charges would require proof of a sexual act, but not any specific relationship between the Defendant and L.J., the Defendant's Sixth Amendment rights did not attach to the Federal charges prior to the officers' interview.  Therefore, we find that the officers' interview of the Defendant did not violate the Defendant's Sixth Amendment rights.

      b.    <u>The Fifth Amendment</u>.  Pursuant to <u>Edwards</u>, in the context of the Fifth Amendment, "[a] suspect who invokes the <u>Miranda</u> right to counsel may not be reapproached by police unless counsel is made available."  <u>United States v. Harris</u>, 221 F.3d 1048, 1051 (8th Cir. 2000). However, as we previously noted, in order

_____

[8](...continued)
abuse of L.J., by the Defendant, was also charged under the Child Endangerment statute.  See, <u>Government's Exhibit 5</u>.

- 22 -

to successfully invoke a right to counsel, a suspect's request must be unambiguous, and unequivocal.  See, <u>Davis v. United States</u>, supra at 459; <u>McNeil v. Wisconsin</u>, supra at 178.  Furthermore, "if a suspect makes a reference to an attorney that is ambiguous or equivocal * * * [such] that the suspect **might** be invoking his right to counsel, our precedents do not require the cessation of questioning."  <u>Id.</u> [emphasis in original].  Accordingly, the question presented is whether the Defendant's statement, "Um, do you mind if I have my lawyer with me?" constituted an unequivocal invocation of his right to counsel.  We find that it did not.[9]

---

[9]As the Court did, in <u>United States v. Eastman</u>, 256 F. Supp.2d 1012, 1016 n. 4 (D.S.D. 2003), we harbor some concern about "whether a person who is admitted to practice law in tribal court, but not elsewhere, is a 'lawyer' within the meaning of <u>Miranda v. Arizona</u>."  See, <u>Fare v. Michael C.</u>, 442 U.S. 707, 722 (1979)(request for a probation officer does not constitute an invocation of <u>Miranda</u> rights).  In discussing this question, the Court noted that, in the Cheyene River Sioux Tribal Courts, Public Defenders, were not licensed attorneys, but the Court also recognized that the unlicenced Public Defenders were "in a position to provide the type of legal assistance necessary to protect the Fifth Amendment rights of an accused undergoing custodial interrogation that a lawyer can offer."  <u>United States v. Eastman</u>, supra at 1016 n. 4.  In a similar vein, the Court, in <u>United States v. Fredricks</u>, 273 F. Supp.2d 1032, 1041 (D.N.D. 2003), found that an advisory, which was provided to the defendant, satisfied his <u>Miranda</u> rights, where he was advised that, pursuant to a provision of the Tribal Code, a "lay advocate" would be appointed for him, in the event that he was unable to afford an attorney.   Specifically, the Court considered the tribal licensing requirements for such "lay advocates," and found that such persons "should possess enough education or knowledge * * * to engage in an informed discussion with a
(continued...)

- 23 -

In order to invoke his right to counsel, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable officer in the circumstances would understand the statement to be a request for an attorney." <u>Davis v. United States</u>, supra at 459.   Applying this standard, the Court of Appeals for the Seventh Circuit recently held that the question, "Can I have a lawyer," was an invocation of the right to counsel.   See, <u>United States v. Lee</u>, 413 F.3d 622, 626 (7th Cir. 2005). Similarly, Courts have held that a statement such as  "maybe I should talk to an attorney by the name of William Evans," see, <u>Abela v. Martin</u>, 380 F.3d 915, 926-27 (6th Cir. 2004), and  "I'd just as soon have an attorney," see, <u>Kyer v. Carlton</u>, 146 F.3d 374, 379 (6th Cir. 1998), also constitute unequivocal invocations of the right to counsel.   See also, <u>Alvarez v. Gomez</u>, 185 F.3d 995, 998 (9th Cir. 1998)(finding the defendant's three questions: "Can I get an attorney right now," "You can have an attorney right now," and "Well, like right now you got one," together constituted an

_____

[9](...continued)
suspect about the wisdom of speaking to law enforcement officers."   <u>Id.</u>

Despite its misgivings, the Court, in <u>Eastman</u>, did not decide this "thorny" issue. Here, we conclude that such a determination is not material to our Recommendation, and we assume, without deciding, that an unequivocal request for an unlicenced Tribal advocate is sufficient to invoke the protections of <u>Miranda</u>.

unequivocal invocation); United States v. Johnson, 400 F.3d 187, 195 (4th Cir. 2005) (holding that suspect who checked "no" on a form which asked whether he "want[ed] to make a statement without his lawyer at this time," unequivocally invoked right to counsel ); United States v. Miller, 2005 WL 8475323 at 3 (D. Neb., December 20, 2005)("There is nothing unclear or equivocal about the statement 'I want to talk to my lawyer.'").

By way of contrast, the statement "Maybe I should talk to a lawyer," that was presented to the Supreme Court in Davis v. United States, supra at 455, was deemed equivocal, as was the statement "Do you know any good attorneys," see, United States v. Kelly, 329 F.3d 624, 630 (8th Cir. 2003), "I think I would like to talk to a lawyer," Clark v. Murphy, 331 F.3d 1062, 1065 (9th Cir. 2003), and "I think I need a lawyer," Burket v. Angelone, 208 F.3d 172, 198 (9th Cir. 2000). See also, United States v. Syslo, 303 F.3d 860, 867 (8th Cir. 2002)(finding statement "I don't think I need an attorney for this" was equivocal); United States v. Ramirez, 2002 WL 31933026 at *6-8 (S.D. Iowa, April 16, 2002)(holding that the defendant's question to an officer of whether he thought that the defendant needed an attorney was equivocal); United States v. Segal, 207 F. Supp.2d 835, 841 (N.D. Ill. 2002) (holding that the defendant did not invoke his right to counsel, when he told the officers "you

can talk to my lawyer"); <u>Williams v. Larson</u>, 2003 WL 1785807 (N.D. Cal., March 31, 2003)(holding that the defendant's statement, that he had talked to counsel who had told him not to talk, was not an invocation of the right to counsel); <u>United States v. Sprouse II</u>, 2002 WL 15866 (W.D. Va., January 8, 2002)(same); cf., <u>Bruni v. Lewis</u>, 847 F.2d 561, 564 (9th Cir. 1988)(holding that the defendant did not unambiguously invoke his right to counsel when he stated, in response to an officer's request that he answer questions, "[n]ot without my attorney," and then immediately added, "[w]ell, ask your questions and I will answer those I see fit").

In the context of a Habeas Petition, our Court of Appeals was recently presented with the question of whether a State Court's finding, that the statement, "Could I call my lawyer," was equivocal, constituted an unreasonable application of clearly established Federal law.  See, <u>Dormire v. Wilkinson</u>, 249 F.3d 801, 806 (8th Cir. 2001), cert. denied, 534 U.S. 962 (2001).  In its analysis, the Court noted that the State Court's conclusion was premised upon the principle announced in <u>Davis</u>, and the State Court had concluded that the Petitioner did not request the assistance of counsel, but only requested to call his attorney.  The Court also noted that, since the interviewing officer had answered "yes" to the petitioner's question of whether he could call his lawyer, the State Court had found that the petitioner "was given the

opportunity [to call an attorney], and for reasons only known to him, declined to do so." Id. at 803-04.   Based on these findings, the Court held that the State Court's conclusion, that the petitioner's statement was equivocal, did not constitute an unreasonable application of clearly established Federal law.   See also, United States v. Eastman, 256 F. Supp.2d 1012, 1019 n. 6 (D.S.D. 2003)(finding, in dicta, that the question, "Can I have a lawyer" "[w]as not an unequivocal request for counsel within the meaning of Davis and its progeny"), citing 2 W. LeFave, J. Israel, N. King, Criminal Procedure, §6.9(g) at pp. 609-112, n. 148; but see, United States v. Lee, supra at 626 (statement, "Can I have my lawyer" was proper invocation of Miranda).

Here, we find that the Defendant's question, "Um, do you mind if I have my lawyer with me?," was equivocal, in the sense that it was reasonable for the officers to conclude that the Defendant was asking whether they had a preference concerning the presence of counsel at the interview, rather than an expression of the Defendant's desire not to talk to the officers outside of the presence of counsel. See, Mueller v. Angelone, 181 F.3d 557, 573-74 (4th Cir. 1999), cert. denied, 527 U.S. 1065 (1999) (finding statement, "Do you think I need an attorney here," to be equivocal);  United States v. Ogbuehi, 18 F.3d 807, 813 (9th Cir. 1994)(holding that statements, "Do I need a lawyer" and "Do you think I need a lawyer," were ambiguous); Delap v.

- 27 -

Dugger, 890 F.2d 285, 294-95 (11th Cir. 1989), cert. denied 496 U.S. 929 (1990)

(holding that petitioner who informed officers that he had a lawyer on another charge

did not invoke right to counsel).   We find no appreciable difference between a

defendant's assertion that, "Maybe I should talk to a lawyer," as was the case in

Davis, and "Um, do you mind if I have my lawyer with me?," as was the case here.

Neither comment disclosed an unequivocal request for the assistance of counsel.   See,

Davis v. United States, supra at 462.

Moreover, we are mindful that, in Davis, the Supreme Court did not require the

interviewing officers to ask clarifying questions following an equivocal invocation of

counsel, but certainly did not prohibit such a limited inquiry.   As the Court explained:

> Of course, when a suspect makes an ambiguous or
> equivocal statement it will often be good police practice for
> the interviewing officers to clarify whether or not he actually
> wants an attorney. * * * Clarifying questions help protect
> the rights of the suspect by ensuring that he gets an attorney
> if he wants one, and will minimize the chance of a
> confession being suppressed due to subsequent judicial
> second-guessing as to the meaning of the suspect's
> statement regarding counsel.   But we decline to adopt a rule
> requiring officers to ask clarifying questions.

Id. at 461-62.

Here, Johnson asked clarifying questions after the Defendant's reference to a lawyer.

First, an inquiry was made as to whether the reference was to a "court appointed

lawyer or what's the deal?"  To this inquiry, the Defendant responded:  "Yeh, from the Red Lake Courts here."   Then, Johnson asked: "If, ah, I suppose we can make arrangements," and "[i]s that what you would like us to do?"  When the Defendant responded, "Um, as far as, well as far as what you need to know I don't know what you want to know," and Johnson replied, "Well, there is some allegations that there is sexual contact and by that we are talking about sexual intercourse."   The Defendant then stated "[a]lright," and the interview proceeded without any further request for legal counsel, or any refusal, on the Defendant's part, to answer any question that was put to him by law enforcement.   Given this context, we are unable to find that "a reasonable officer in light of the circumstances would have understood" the Defendant's statement as a request to confer with counsel.   <u>Davis v. United States</u>, supra at 459.  Indeed, when directly questioned as to whether he wanted the officers to arrange for his counsel to be present, the Defendant did not make such a request.

To the extent that it might be urged that the Seventh Circuit's reasoning, in <u>United States v. Lee</u>, supra, would reach a different result, we disagree.  There, after concluding that the statement "Can I have a lawyer?," was a proper invocation of the defendant's right to counsel, the Court went on to add:  "Therefore, unless the police obtained further clarification from Lee that this was actually an unequivocal request for

- 29 -

an attorney, they should have halted the interrogation."   United States v. Lee, supra at

626.   We read this statement as reflecting the Court's conclusion that, while the

comment of the defendant, there, properly invoked a right to counsel, but remained

equivocal, since, an unequivocal invocation of Miranda would have precluded further

questioning of the defendant.   However, the Court encouraged further questioning,

reasoning as follows:

> Before proceeding with the analysis, we remind police
> officers of the instruction the Supreme Court offered in
> Davis.   "[w]hen [sic] a suspect makes an ambiguous or
> equivocal statement it will often be good police practice for
> the interviewing officers to clarify whether or not he actually
> wants an attorney."   512 U.S. at 461, 114 S.Ct. 2350.   By
> affirmatively establishing whether a suspect invoked
> counsel, police (and reviewing courts) can know precisely
> where they stand.   We highly encourage police to follow the
> advice offered by the Supreme Court and take the time to
> clarify such issues at the time of interrogation rather than in
> after-the fact arguments before the courts.

Id. at 626-27.

In Lee, the police did not ask the defendant clarifying questions, as Johnson did here,

but engaged in conduct that was, to the Court, a "matter of some concern."   Id. at

627.   Ultimately, the Court determined that any misstep in the questioning of the

defendant, there, was harmless error.   Id.   Accordingly, we find Lee to be somewhat

enigmatic but, to the extent that the Court appears to have encouraged clarifying

questions to the interviewing officers, there, we find that encouragement consistent with the practice followed by Johnson.

More importantly, as was the case in <u>Dormire</u>, the Defendant was provided an opportunity to have the officers arrange for the presence of an advocate and, "for reasons known only to him, declined to do so." <u>Dormire v. Wilkinson</u>, supra at 806. While <u>Dormire</u> determined that the interrogating officers had no obligation to ask clarifying questions, after the petitioner's statement, "Could I call my lawyer?," it did so simply because the petitioner's "statement was not an unambiguous or unequivocal request for counsel," so "the officers ha[d] no obligation to stop questioning him or to ask clarifying questions." <u>Id.</u> at 805 n. 2, quoting <u>Davis v. United States</u>, supra at 461-62. Accordingly, the result we reach is also consonant with the Court's holding, in <u>Dormire</u>, and we find that the Defendant's Fifth Amendment rights were not violated by the officers continued questioning of the Defendant.[10]

_____

[10]The second statement was provided at the request of the Defendant, upon his apparent belief that, since he had provided some information to the officers during the morning interview, it would be in his best interest to provide the officers with more information. Prior to that statement, the Defendant was advised of his <u>Miranda</u> rights, and he stated that he understood those rights. While the inflection of the Defendant's voice, and the pause following the officers' initial inquiry into the purpose of his request to speak with them, might suggest some reluctance, on the Defendant's part,

(continued...)

In sum, we find that the officers' questioning of the Defendant did not violate either his Sixth Amendment rights, under <u>Massiah v. United States</u>, supra, or his Fifth Amendment rights, under <u>Edwards v. Arizona</u>, supra. Therefore, we recommend that his Motion for the Suppression of Confessions and Statements be denied.[11]

---

[10](...continued)

to provide more information to the officers, we cannot impose upon the interviewing officers the task of interpreting such nuances and intonations as a desire to remain silent. Rather, the Record is unequivocal that the Defendant requested a second interview, at which he expressed his understanding of his <u>Miranda</u> rights before providing the officers with additional information. Based on those circumstances, and in the absence of any suggested coercion on the part of the officers, we find that the Defendant knowingly, intelligently, and voluntarily, waived his <u>Miranda</u> rights prior to the second statement. See, <u>United States v. Valle</u>, 644 F.2d 374, 375 (8th Cir. 1981)("A voluntary waiver need not take any particular form; * * * it may be made orally by replying to questions," and "[a] valid waiver of rights need not an express declaration to that effect."); <u>North Carolina v. Butler</u>, 441 U.S. 369, 375-76 (1979)(finding that an explicit waiver is not necessary where the defendant volunteered incriminating statements).

[11]Although Minnesota law does not apply, we do note that Johnson's clarifying questions are also consistent with the approach adopted by the Minnesota Supreme Court. In <u>State v. Staats</u>, 658 N.W.2d 207, 213 (Minn. 2003), the Supreme Court reiterated:

> Under Minnesota's rule of law, police must stop interrogating an accused even if the accused makes an ambiguous or equivocal statement regarding counsel, so long as the statement is one "that could reasonably be construed as an invocation of the accused's right to counsel, except for narrow questions designed to clarify the

(continued...)

B.    The Defendant's Motion to Suppress Evidence Obtained as a Result of
Search and Seizure.

1.    Standard of Review.   In the issuance of a Search Warrant, the

Fourth Amendment dictates that an impartial, neutral, and detached, Judicial Officer

will assess the underlying factual circumstances so as to ascertain whether probable

cause exists to conduct a search, or to seize incriminating evidence, the

instrumentalities or fruits of a crime, or contraband.  Warden v. Hayden, 387 U.S. 294

(1967); United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516

U.S. 1139 (1996).  In order to find probable cause, it must be demonstrated that, in

light of all the circumstances set forth in the supporting Affidavit, there is a fair

probability that contraband, or evidence of a crime, will be found in a particular,

designated place.  United States v. Gladney, 48 F.3d 309, 313 (8th Cir. 1995); United

States v. Tagbering, 985 F.2d 946, 949 (8th Cir. 1993).  For these purposes, probable

cause is "a fluid concept, turning on the assessment of probabilities in particular

factual contexts, not readily, or even usefully, reduced to a neat set of legal rules."

---

[11](...continued)
accused's true desires regarding counsel."   State v. Risk,
598 N.W.2d 642, 648-49 (Minn. 1999).

Illinois v. Gates, 462 U.S. 213, 232 (1983); see also, Ornelas v. United States, supra at 695.

"Search warrant '[a]pplications and affidavits should be read with common sense and not in a grudging hyper technical fashion.'" United States v. Ryan, 293 F.3d 1059, 1061 (8th Cir. 2002), quoting United States v. Goodman, 165 F.3d 610, 613 (8th Cir. 1999), cert. denied, 527 U.S. 1030 (1999).   In conducting such an examination, the Court should review the Affidavits as a whole, and not on a paragraph-by-paragraph basis.   United States v. Anderson, 933 F.2d 612, 614 (8th Cir. 1991); Technical Ordnance, Inc. v. United States, 244 F.3d 641, 649 (8th Cir. 2001), cert. denied, 534 U.S. 1084 (2002).   Moreover, the reviewing Court must not engage in a de novo review but, rather, should accord great deference to the decision of the Judicial Officer who issued the Warrant.   United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995); United States v. Curry, 911 F.2d 72, 75 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991).   This mandated deference to the determination of the issuing Judicial Officer is consistent with the Fourth Amendment's sound preference for searches that are conducted pursuant to Warrants.   Illinois v. Gates, supra at 236.

2.      <u>Legal Analysis</u>.  The Defendant has asked us to review the Search Warrant, which was issued on September 9, 2005, for the residence of Ruby Whitefeather, in order to determine whether the Warrant was supported by probable cause, or contained any other facial defects.[12]   The Search Warrant authorized a search for bedding, linen, and clothing, which might contain evidence of a sexual assault, pornographic videotapes, birth control patches, and indicia of residence for L.J., and the Defendant.  <u>Government Exhibit 4</u>.

In support of the Search Warrant Application, Nelson submitted an Affidavit, which detailed the events that caused him to suspect that evidence of a sexual assault would be found at the residence of Ruby Whitefeather.  Specifically, Nelson detailed the information that had been received, from Red Cloud, concerning the two reported incidents of the Defendant inappropriately kissing L.J., as well as L.J.'s representations, during an interview with Red Cloud, that the Defendant had sexually

---

[12]The Defendant also challenged the Search Warrant on the ground that some of the information contained therein -- namely information provided by the Defendant during the interview of September 8, 2005 -- was unlawfully obtained.  Since we find no constitutional infirmity with the interviews of the Defendant, we find no basis to recommend suppression on that ground.

assaulted her, approximately one and one-half weeks earlier, while residing at Ruby Whitefeather's residence.

Nelson also attested to the information that was provided by the Defendant, during the interview of September 8, 2005. Specifically, Nelson averred that the Defendant had admitted that he resided at Ruby Whitefeather's residence, along with L.J.; that he shared a bed with L.J., and his eighteen month old daughter; that he has had a sexual relationship with L.J., which had continued from the time that she was ten and one-half years old, until the Defendant was arrested on September 4, 2005; and that he had ejaculated into a baby blanket and discarded the blanket in a bedroom at the residence.

Plainly Nelson's averments were sufficient to provide probable cause to believe that evidence of a sexual assault would be discovered at the home of Ruby Whitefeather. Notably, the sexual assault reported by L.J. had occurred in the house, less than two weeks earlier, and the Defendant had admitted to having an ongoing sexual relationship with L.J., at Ruby Whitefeather's residence. Accordingly, since we find that the Search Warrant was supported by probable cause, and the Defendant has not alerted us to any other facial defects in the Search Warrant, nor has our

independent review disclosed any, we find that the Search Warrant was valid.[13]

Therefore, we recommend that the Defendant's Motion to Suppress Evidence

Obtained as a Result of Search and Seizure be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Defendant's Motion to Exclude Statements and Confessions

[Docket No. 21] be denied.

2.     That the Defendant's Motion to Suppress Evidence Obtained by Search

and Seizure [Docket No. 18] be denied.

Dated: January 17, 2006                  s/Raymond L. Erickson
                                          Raymond L. Erickson
                                          CHIEF U.S. MAGISTRATE JUDGE

**NOTICE**

---

[13]Furthermore, we would be compelled, by the law of this Circuit, to find that the officers' reliance upon the Search Warrant was reasonable, as it "was not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon."  United States v. McNeil, 184 F.3d 770, 775 (8th Cir. 1999), citing United States v. Leon, 468 U.S. 897, 922-23 (1984).

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than February 3, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than February 3, 2006**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.