**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | Criminal No. 05-388(1) (DWF/RLE) |
| Plaintiff, | |
| v. | **FINDINGS OF FACT,** **CONCLUSIONS OF LAW,** **AND ORDER FOR CONVICTION** |
| Randall Gene Whitefeather, | **OF AGGRAVATED SEXUAL ABUSE** **AND SEXUAL ABUSE OF A MINOR** |
| Defendant. | |

Tracy T. Braun, Assistant United States Attorney, United States Attorney's Office, counsel for Plaintiff.

James E. Ostgard, II, Esq., Ostgard Law Office, counsel for Defendant.

The Honorable Donovan W. Frank, Judge of the above-named Court, held a bench trial in the above-entitled matter on October 2 and 3, 2006 because the Government and Defendant Randall Gene Whitefeather ("Defendant") waived their right to a jury trial.

The indictment charges Defendant with two counts. Count 1 charges Defendant with aggravated sexual abuse alleging that on or about April 23, 2002 through June 23, 2004, in the State and District of Minnesota, and within the boundaries of the Red Lake Indian Reservation, Defendant, an enrolled member of the Red Lake Band of Chippewa Indians, did knowingly engage in a sexual act with another person, namely L.L.J., who had not yet attained the age of twelve (12) years, in violation of Title 18, United States Code, Sections 1151, 1153, 2241(c), and 2246(2). Count 2 charges Defendant first with sexual abuse of a

minor alleging that on or about May 24, 2005 through July 28, 2005, in the State and District of Minnesota, and within the boundaries of the Red Lake Indian Reservation, Defendant, an enrolled member of the Red Lake Band of Chippewa Indians, did knowingly engage in a sexual act with a minor, namely L.L.J., who was at that time at least twelve (12) years, but not yet sixteen (16) years of age, and at least four (4) years younger than Defendant, in violation of Title 18, United States Code, Sections 1151, 1153, 2243(a)(1), and 2246(2).

The Court received evidence from the following witnesses during the course of the trial: the alleged minor victim, whose initials are L.L.J.; Cora Rosebear; Arlene Brown; Leonard Red Cloud; Beth Carter; Gerald Johnson; and Luanne Coch. In addition, the Court received exhibits in this case, including the taped and transcribed statements in the nature of admissions of Defendant, identified as Government's Exhibits 1, 2, and 3, as well as the Federal Bureau of Investigation ("FBI") reports representing summaries of interviews with L.L.J., introduced as Defendant's Exhibits 1 and 2.

Based upon the presentations of counsel, the testimony and exhibits received, and the Court having received written closing arguments from counsel, and being otherwise duly advised in the premises, the Court hereby makes the following:

**FINDINGS OF FACT**

1. Defendant's date of birth is May 4, 1967.

2. L.L.J.'s date of birth is June 23, 1992. Consequently, at all times relevant to the Court, Defendant is and has been four years older than L.L.J. L.L.J. does not know who

her biological father is. She is the oldest of her mother, Linda John's, six children. The other children are J.I., age 12; A.I., age 10; A.I., age 8, C.W., age 6; and C.W., age 3. L.L.J. used to be C.W.'s primary caregiver. Defendant is the father of C.W., age 6, and C.W., age 3. DeWayne Iceman is the father of J.I., age 12; A.I., age, 10, and A.I., age 8.

L.L.J. has known and lived with Defendant on and off for the past seven years. In September 2005, J.I., A.I., A.I., and L.L.J. were living at the home of Phyllis Iceman, DeWayne Iceman's mother, who lives with Edward Dow in Ponemeh, Minnesota. C.W., age 6, was living with L.L.J.'s aunt, Sue Cobenais, and C.W., age 3, was in foster care.

Based upon the record before the Court, the Court will sadly summarize the different places L.L.J. has lived. L.L.J. lived in two homes in Ponemeh, the first of which was at DeWayne Iceman's house when L.L.J. was in the second grade. From the third to the fourth grade, L.L.J. lived in another home for a couple of months when DeWayne Iceman was no longer with L.L.J.'s mother. In the fourth grade, L.L.J. moved to a house on Irvin Avenue in Bemidji, Minnesota, with her mother. L.L.J. and her mother remained at that home for approximately six months before moving to a trailer home on the opposite side of Bemidji near Northern Elementary School. L.L.J. lived there with her mother for about one and one-half years, which was in and around 2003 when L.L.J. was in the fifth grade. In February or March 2005, when L.L.J. was in the sixth grade, she moved with her mother and Defendant to Laporte, Minnesota, to a house, and L.L.J. began attending school in Laporte. L.L.J. remained there for approximately five months. L.L.J.'s mother moved out before she did, although Defendant remained with L.L.J. In approximately May 2005, L.L.J. was still

3

living in Laporte when she was involved in the theft of a car with some friends. As a result, L.L.J. was detained in Bemidji between May 26 and May 31, 2005, at the Northwest Juvenile Center. While she was detained, Defendant brought her money. When L.L.J. left Laporte, the other children, except C.W., age 3, went to live with DeWayne Iceman at his mother's home. During that time, L.L.J. would come to Ponemeh to spend time with her brother and sisters. C.W., age 6, and C.W., age 3, who were living there.

In the late spring/early summer of 2005, at the request of L.L.J.'s mother, she and C.W., age 3, and her sister C.W., age 6, moved with the Defendant to Defendant's mother's house in Redby, Minnesota. It remained L.L.J.'s responsibility to be the primary caretaker of her sister, C.W., age 3. Defendant also requested that L.L.J. take care of C.W., age 6, because it was too much responsibility for the Defendant. L.L.J.'s mother remained in Laporte. In June 2005, L.L.J. moved with her sister, C.W., age 3, and Defendant to Ruby Whitefeather's home in Bemidji. Defendant, L.L.J., and C.W., age 3, shared a room and a bed in Ruby Whitefeather's apartment. Also living there was Ruby's son, Marvin Strong; Marvin's girlfriend, Bethel Crawford; and Richard Strong. L.L.J. remained at Ruby Whitefeather's for approximately a week and then left to go live with her mother in Boy River, Minnesota. At that time, her mother was living with her boyfriend, Orlando Fineday and had left Defendant alone with C.W., age 3. During L.L.J.'s absence from the residence where Defendant was living at Ruby Whitefeather's, L.L.J. states that Defendant tried to commit suicide after leaving a message for her at her mother's residence. L.L.J. stated that it was her belief that Defendant tried to commit suicide because she had moved out.

      3.      On or about September 5, 2005, Cora Rosebear, a resident of Red Lake, while at a Pow Wow on the Red Lake Indian Reservation, observed L.L.J. pushing a stroller with a young child in it, and she observed that L.L.J. was approximately 12 years old. Ms. Rosebear saw L.L.J. engaged in a kiss with a grown man for approximately five seconds. In the words of Cora Rosebear, "I had never seen anything like that before."

      Cora Rosebear's testimony and her demeanor in the courtroom were consistent with someone who was upset with what she had observed. Defendant was the grown man that L.L.J. was seen kissing. It would appear that it was L.L.J. who reached up and initiated the kiss with Defendant. However, irrespective of who initiated the kiss, the Court finds, consistent with the reaction of Cora Rosebear, that the kiss was not a loving and affectionate peck on the lips between a father figure/close relative and a 12-year-old child; rather, it was a romantic and therefore, inappropriate kiss between a grown man and a minor child.

      4.      Both L.L.J. and Defendant have acknowledged the kiss as observed by Cora Rosebear.

      5.      Cora Rosebear reported the kissing incident to Arlene Brown, a Red Lake child protection worker. Arlene Brown then contacted the Red Lake Police Department, and eventually the FBI and the Bemidji Police Department became involved.

      6.      In September 2005, law enforcement and social workers took statements from L.L.J. and Defendant. In addition, in September 2005, Beth Carter, a nurse at the Midwest Children's Resource Center, evaluated L.L.J.

7. The Government introduced at trial Government Exhibits 1, 2, and 3, representing two statements in the nature of confessions given by Defendant on September 7, 2005.

8. On September 7, 2005, Defendant admitted that he had been engaged in a sexual relationship with the minor child, L.L.J., for 2 years and 8 months. If the Court goes back 2 years and 8 months from September 7, 2005, that creates an approximate time period during which sexual relations, including sexual intercourse between Defendant's penis and the minor child's vagina occurred from the time period of on or around February or March 2003, if not earlier, at which time L.L.J. would have been between 10 and 11 years old, L.L.J. turning 11 on June 23, 2003, and 12 on June 23, 2004. In other words, the Court finds that Defendant, in his statement to law enforcement authorities on September 7, 2005, acknowledged sexual relations with L.L.J. at least in early 2003, at a time when L.L.J. was 10 and soon to be 11. Because L.L.J. did not turn 12 until June 23, 2004, there was a period of at least 15 to 16 months of sexual contact between Defendant and L.L.J. during which L.L.J. had not attained the age of 12 years.

9. Defendant had a romantic relationship with L.L.J.'s mother beginning in approximately 1998. Defendant admitted that when he was released from prison in 2001, he moved back with L.L.J. and her mother. Defendant stated that it was at that time that he began to have sexual relations with L.L.J., in part because his sexual relationship with L.L.J.'s mother had deteriorated and was otherwise strained. Defendant admitted that he

had already started having sexual intercourse with L.L.J. when his daughter, C.W. was born in March 2004.

10. In June and July of 2005, Defendant and L.L.J. were living at the home of Bonita Whitefeather, who is Defendant's mother. Bonita Whitefeather's home is located in Redby, Minnesota, which is located within the exterior boundaries of the Red Lake Indian Reservation. Defendant admits having sex, "for the whole time that I had her, except when she was with her mom or when she was on her period." Defendant went so far as to say that he was hoping to have a baby with L.L.J. when she turned 18. In June and July of 2005, L.L.J., having turned 12 on June 23, 2004, was at least 12 and younger than 16 when Defendant engaged her in sexual relations at Bonita Whitefeather's home on the Red Lake Indian Reservation.

11. Admittedly, the sexual relations between Defendant and the minor child occurred both on and off the Red Lake Indian Reservation. Both Defendant and L.L.J. acknowledged that the sexual relations occurred within the boundaries of Red Lake Indian Reservation at Bonita Whitefeather's home.

12. L.L.J. testified that the sexual touching, as she called it, began when she was only 8 years old and that it eventually progressed to sexual intercourse which she defined, consistent with the statement of Defendant, as the insertion of Defendant's penis into her vagina. The Court finds credible and believes the testimony of L.L.J. The Court finds credible and believes Defendant's corroboration of L.L.J.'s victim statement and, in actual fact, finds that L.L.J.'s and Defendant's statements corroborate each other.

13. Both L.L.J. and Defendant acknowledged that their first sexual intercourse occurred at Ridgeway Apartments in Bemidji, Minnesota, which is not within the boundaries of the Red Lake Indian Reservation. However, L.L.J. testified that Defendant had engaged in sexual intercourse with her, defined as Defendant putting his penis into her vagina, while they lived at Bonita Whitefeather's home in Redby, Minnesota. While both parties lacked the exactitude with respect to where each act occurred, they both agreed that a number of acts of sexual intercourse had occurred at Bonita Whitefeather's home.

The Court finds and concludes that more than one act of sexual intercourse occurred at Bonita Whitefeather's home between Defendant and L.L.J., with one or more acts occurring in the shower and one or more acts occurring in the bedroom of the home. In fact, in the bedroom, at times, with the consent of L.L.J.'s mother, Defendant, L.L.J. and L.L.J.'s mother shared a bed. On at least one occasion, the Court must sadly note, L.L.J.'s mother was aware that Defendant and L.L.J. were in the shower together, although she claims that she was unaware that Defendant and L.L.J. were having sexual intercourse in the shower.

The Court finds the testimony of Defendant, and the details provided by Defendant in his second statement given on September 7, 2005, to be credible and consistent with the other evidence in the case.

More significantly, not only does the testimony of L.L.J. corroborate the testimony of Defendant, but L.L.J.'s testimony, by itself, establishes that sexual abuse occurred between Defendant and L.L.J. on the Red Lake Indian Reservation at a time when Defendant

was more than four years older than L.L.J. and at a time when L.L.J. was less than 12 years old. Sadly, the sexual abuse then continued after L.L.J. was 12 years old, up until Defendant's arrest in September 2005.

14.     Defendant, by his own testimony, continued to drink alcoholic beverages until four months prior to September 7, 2005. To make a fair and complete evaluation of the evidence in this case, the Court does not need to reach the issue–and the record is not clear–of how many occasions, if any, Defendant was under the influence of alcohol during his sexual contact with L.L.J.

15.     There is much self-corroborating evidence and self-verification in Defendant's statement itself, apart from L.L.J.'s own credible and truthful testimony and prior statements.

16.     Defendant's relationship with L.L.J.'s mother became strained over time. In fact, and again quite sadly, it was L.L.J.'s mother who suggested giving physical custody to Defendant for a variety of reasons when she went into chemical dependency treatment. Defendant was a father figure to L.L.J., as was DeWayne Iceman.

17.     Defendant justified his relationship with L.L.J. by convincing himself that the he and L.L.J. were engaging in consensual sex. He viewed L.L.J. as an unusually developed 9-14-year-old because she developed pubic hair and breasts early.

18.     The record is not clear as to whether there were locks on the bedroom or bathroom doors at the various places Defendant lived, both with and without L.L.J. and her mother and at Bonita Whitefeather's home, during the relevant time period. The evidence

establishes that, at times, L.L.J. would walk in on her mother and Defendant having sex and/or watching what Defendant described as pornographic movies. Defendant, however, denies watching such pornographic movies with L.L.J.

19. Defendant inappropriately treated L.L.J. as a young adult. For instance, Defendant and L.L.J.'s own biological mother placed the entire responsibility of raising L.L.J.'s younger sister, C.W., age 3, on L.L.J. virtually from the day C.W. was born.

20. When L.L.J.'s mother believed that L.L.J. was close to having her first period, which was at the same time that L.L.J. was caring for C.W., L.L.J.'s mother requested that the Defendant take L.L.J. to the doctor so she could get a birth control patch when she began having her period. In fact, Defendant was well aware of the specific five or six alternative locations where the patch would be located, from time to time, on L.L.J.'s body.

21. Defendant specifically admitted to engaging in vaginal intercourse with L.L.J. and from time to time ejaculating on L.L.J.'s stomach.

22. Defendant admitted having sexual relations in the same bed while L.L.J.'s mother was asleep and at other times while L.L.J.'s mother was at work. Defendant noted that he got out of prison in 2001 and that he began to engage in sexual relations with L.L.J. in 2002.

23. Defendant admitted giving L.L.J. hickeys and that the hickeys found on L.L.J. were from him.

24. The attitude displayed by Defendant in his statements; the specificity with which he described the relationship and the sexual contact, including oral sex by himself on L.L.J. and by L.L.J. on him; asking L.L.J. to use his hands in the early years to touch his penis; and the vaginal intercourse between his penis and L.L.J.'s vagina, all lend corroboration, credibility, and self-verifying detail to Defendant's statement given to the authorities, separate from the corroboration and truthful testimony of L.L.J.

25. In fact, Defendant acknowledged having sexual relations with L.L.J. on a nightly or weekly basis during the four months preceding September 2005.

26. While it is true that there were recantations from time to time by L.L.J. over the years, any recantations or inconsistencies were consistent with her being a victim of aggravated sexual abuse in Count 1 and sexual abuse of a minor in Count 2 and were not inconsistent with Defendant's testimony with respect to his admission to sexual relations with L.L.J. for at least 2 years and 8 months preceding September 2005.

27. Beth Carter, a nurse from the Midwest Children's Resource Center, testified that victims like L.L.J. often recant or deny their claims for a number of reasons, including, but not limited to, lack of family support or any other kind of support. Sadly, the Court finds that L.L.J.'s own mother did not believe her, and, when L.L.J. did report the abuse from time to time, as far back as when she was 9 years old, no one, including her mother, believed her or supported her. Moreover, and quite tragically, no one, including the school that L.L.J. was attending, investigated or otherwise reported to any law enforcement agency the reports of sexual contact or abuse being made by L.L.J. Sergeant Leonard Red Cloud

testified that, in his experience, although required to do so, schools do not report abuse allegations to law enforcement in three out of four cases.

Beth Carter also testified that victims like L.L.J. often recant or deny their claims because they fear a break-up in the family unit. This is especially true in this case where Defendant, as L.L.J.'s father figure, used his position of authority over L.L.J. to begin the sexual abuse. Tragically, when L.L.J. did tell the truth about Defendant's abuse, the system revictimized her in September 2005 when it broke up her family unit by separating L.L.J. from C.W., the younger sister she had primarily cared for since birth. In fact, the Court must observe that some of the saddest moments in the trial and saddest moments in the life of L.L.J. were when she testified about C.W. and how she felt when she was separated from C.W. Of course, L.L.J.'s detailed accounts of the sexual abuse by Defendant and her reaction to the system's lack of protection and belief of her statements were also very sad moments.

28. Based upon her experience with victims of sexual abuse, Beth Carter observed L.L.J. to exhibit behavior consistent with being a victim of sexual abuse. This testimony corroborates both Defendant's statement and is consistent with L.L.J.'s behavior of being a victim of sexual abuse for a period not less than 2 years and 8 months preceding September 7, 2005.

29. That any conclusion of law which is deemed a finding of fact is deemed incorporated herein as such.

Based upon the above findings of fact, the Court now makes its:

## CONCLUSIONS OF LAW

1. Based upon the above findings of fact and evaluation of the evidence and all of the circumstantial inferences therefrom, including the credibility of all witnesses before the Court, the Court concludes that Defendant engaged in one or more sexual acts with L.L.J. between April 23, 2002 and June 23, 2005, at a time when L.L.J. had not yet attained the age of 12. The Court further concludes that one or more of the sex acts that occurred between Defendant and L.L.J. between April 23, 2002, and June 23, 2004, occurred within the exterior boundaries of the Red Lake Indian Reservation.

2. The Court finds and concludes that Defendant is an enrolled member of the Red Lake Band of Chippewa Indians.

3. Based upon the findings of fact above and the Court's evaluation of the evidence, the Court concludes that the United States has proven, by proof beyond a reasonable doubt, that Defendant is guilty of aggravated sexual abuse as set forth in Count 1 of the indictment, pursuant to Title 18, United States Code, Sections 1151, 1153, 2241(c), and 2246(2).

4. Based upon the findings of fact above and the Court's evaluation of the evidence, the Court concludes that the United States has proven, by proof beyond a reasonable doubt, that Defendant is guilty of sexual abuse of a minor as set forth in Count 2 of the indictment pursuant to Title 18, United States Code, Sections 1151, 1153, 2243(a)(1) and 2246(2).

5.      That any finding of fact which is deemed a conclusion of law is incorporated herein as such.

Based upon the above findings of fact and conclusions of law, this Court enters the following:

**ORDER**

1.      That pursuant to the above findings of fact and conclusions of law, the Court hereby finds Defendant **GUILTY** of Count 1 of the indictment, namely aggravated sexual abuse pursuant to Title 18, United States Code, Sections 1151, 1153, 2241(c), and 2246(2).

2.      That pursuant to the above findings of fact and conclusions of law, the Court hereby finds Defendant **GUILTY** of Count 2, of the indictment, namely sexual abuse of a minor pursuant to Title 18, United States Code, Sections 1151, 1153, 2243(a)(1), and 2246(2).

3.      Accordingly, the Court respectfully directs the Clerk of Court to enter convictions consistent with the findings of fact and conclusions of law of this Court.

4.      The Court further respectfully directs that the United States Probation Office prepare a Presentence Report pursuant to the guilty verdicts of this Court.


Dated:  October 18, 2006                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            Judge of United States District Court